UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
JOHN FINNIGAN, *individually and on behalf
of others similarly situated*,

                      Plaintiff,               **MEMORANDUM & ORDER**
                                                    19-CV-0516 (PKC) (JAM)

          - against -

METROPOLITAN TRANSPORTATION
AUTHORITY and NEW YORK CITY
TRANSIT AUTHORITY,

                     Defendants.
-------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

        Plaintiff John Finnigan ("Finnigan" or "Plaintiff") and 26 opt-in Plaintiffs (collectively

"Plaintiffs") bring this action against Defendants Metropolitan Transportation Authority ("MTA")

and the New York City Transit Authority ("NYCTA") (collectively "Defendants") alleging failure

to pay overtime in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*

Defendants have moved both for summary judgment and to decertify the conditionally certified

collective in this case. For the reasons that follow, the Court grants Defendants' motion for

summary judgment in part and denies it in part, and grants in part and denies in part Defendants'

motion for decertification. Plaintiffs' FLSA overtime claim will proceed to trial, but the collective

will be limited to Plaintiffs who worked more than 40 hours per week on the 7-line after October 9,

2017. Plaintiffs are directed to file a list of Plaintiffs they believe can still be included in the

collective within thirty (30) days of this Order, and Defendants may file a motion to strike any

Plaintiffs they believe can no longer be part of the collective within thirty (30) days after Plaintiffs

file their list. The parties are also directed to file a proposed joint pre-trial order pursuant to this

Court's Individual Rules within ninety (90) days of the date of this Order.

# BACKGROUND

## I.    Factual Background[1]

NYCTA, a subdivision of the MTA, operates the New York City subway system.  (*See* Pls.' R. 56.1 Resp. ("Pls.' 56.1"), Dkt. 147-1 ¶¶ 3–4.)  The New York City subway system is the largest rapid transit system in North America, comprised of 472 stations and serving millions of subway riders each day.  (*Id.*)  As a part of its subway service, the NYCTA currently operates 36 train lines.  (*Id.* ¶ 4.)  One of these train lines is the 7-line, which runs between 34th Street in Manhattan and Main Street in Flushing, Queens.  (*Id.* ¶¶ 6, 8–9.)

Train operators (the "operators") operate trains throughout the NYCTA subway system, including on the 7-line.  (*Id.* ¶ 10.)  In addition, operators provide customer service by answering riders' questions.  (John Beato Dep., Dkt. 147-12 at 7:14–19, 34:14–19.)  John Finnigan, the Plaintiff who brought this case, is an operator who has worked on the 7-line at various times since about 2003.  (John Finnigan Dep., Dkt. 147-14 at 8:11–9:24.)  NYCTA train operators, including Finnigan, are represented by Transit Workers Union Local 100 ("the Union").  (Pls.' 56.1, Dkt. 147-1 ¶ 11.)  The terms and conditions of the operators' employment are subject to a

---

[1] Unless otherwise noted, a standalone citation to a party's Local Rule 56.1 statement denotes that this Court has deemed the underlying factual allegation undisputed.  Any citation to a party's Local Rule 56.1 statement incorporates by reference the documents cited therein.  Where relevant, however, the Court may cite directly to an underlying document.  But where Plaintiffs either (i) admit or (ii) deny without citing to admissible evidence certain of the facts alleged in Defendants' Rule 56.1 Statement, the Court may deem any such facts undisputed.  *See* Loc. Civ. R. 56.1(c)–(d); *Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 28, 2012) ("Eastern District Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence.  Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything." (emphasis in original)); *Risco v. McHugh*, 868 F. Supp. 2d 75, 86 n.2 (S.D.N.Y. 2012).  In addition, the Court will not consider "factual assertions" contained in 56.1 statements "that are otherwise unsupported in the record."  *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) (citation omitted).

collective bargaining agreement ("CBA") between the Union and the NYCTA.  (*Id.* ¶ 12.) Pursuant to the CBA, during each six-month period, train operators, in order of seniority, "pick" their schedule for the following six-month period.  (*Id.* ¶ 13; Albert Culler Decl., Dkt. 144-14 ¶ 14) Each schedule is called a "run" and includes start and end times, paid lunch periods of 30–45 minutes, and sometimes, additional duties known as "Work as Assigned" duties.  (Pls.' 56.1, Dkt. 147-1 ¶¶ 13, 15, 61.)  Though some runs are scheduled for less than eight hours, in accordance with the CBA, all train operators are paid for at least eight hours each workday, even if their run is shorter than that.  (*Id.* ¶¶ 16–20.)  Thus, when an operator is assigned to a shift that is scheduled for less than eight hours, they receive additional pay to make up the difference between the number of hours the run is scheduled for and eight hours.  (*Id.* ¶ 20.)  This supplemental pay is called "boost" pay.  (*Id.*)

On a daily basis, a regular train operator's shift begins at a scheduled "reporting time," when they report to the dispatch office at their originating station (typically at one terminus of the line).  (*Id.* ¶¶ 21–22.)  The reporting time is 15 minutes before their first train is scheduled to depart the station.[2]  (*Id.*)  Upon arrival at the dispatch office, operators sign in using a system called "Kronos," read the bulletin board, and receive any updates about the status of service on their line that day.  (Therella Carmichael-Brown Dep., Dkt. 147-4 at 32:12–17; Pls.' 56.1, Dkt. 147-1 ¶ 23.) Operators then proceed to the train, enter, and begin operating the train on their assigned line. (Pls.' 56.1, Dkt. 147-1 ¶ 24.)  For purposes of pay, operators' shifts begin at the scheduled reporting time, which is pre-printed on their run schedules.  (Lisa Maxwell Dep., Dkt. 147-9 at 56:16–58:9.)

---

[2] In addition to regular train operators whose runs cover a single train line, some operators are assigned to work as "relief personnel" or "extras."  (Pls.' 56.1, Dkt. 147-1 ¶ 55.)  These operators are assigned to work on various subway lines based on operational needs.  (*Id.* ¶ 56.)

During the workday, operators receive a lunch break. (Albert Culler Dep., Dkt. 147-6 at 65:3–4.) These breaks are typically scheduled for 30–40 minutes. (*Id.* at 65:6–12.) Because of train delays, however, operators frequently must work through a portion of their lunch break. (Edwin Dixon Dep., Dkt. 147-13 at 105:10–20, 106:3–13.) Moreover, after the train arrives at the terminal station, the operator must bring the train to a complete stop before they can begin their lunch break; this process can take several minutes. (Albert Culler Dep., Dkt. 147-6 at 66:10–21.) If a train operator's lunch break is less than 20 minutes because of these delays, they can fill out an "exception claim form" at the end of their shift, which entitles them to "one half-hour's extra pay" at their regular hourly rate so long as the dispatcher approves it. (*Id.* at 66:22–67:2; CBA Excerpt, Dkt. 144-18 at ECF[3] 3.)

At the end of an operator's run, their paid work time ceases when the first car of their train enters the final station. (Defs.' R. 56.1 Reply ("56.1 Reply"), Dkt. 150 ¶ 26.) However, some 7-line operators also receive pay for up to five minutes of "radio time." (56.1 Reply, Dkt. 150 ¶¶ 45–53.) "Radio time" refers to payment for additional time at the end of a given shift, after the train enters the station. (*Id.* ¶ 45; John Beato Dep., Dkt. 147-12 at 48:2–14.) Specifically, operators whose scheduled runs are more than eight hours long and do not include "Work as Assigned" duties receive pay for five minutes of radio time. (56.1 Reply, Dkt. 150 ¶¶ 45–53.) Operators who receive boost pay (i.e., pay to make up for a run being shorter than eight hours) for fewer than five minutes also receive five minutes of radio time less the amount of boost pay they receive. (*Id.* ¶ 51.) But, if an operator receives five minutes or more of boost time, the operator does not receive any radio time. (*Id.* ¶ 50.)

---

[3] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

After the train enters the station, operators must bring the train to a complete stop, set the emergency break, turn the key off, and exit the train; this process is known as "dumping" the train. (56.1 Reply, Dkt. 150 ¶¶ 26–27; Pls.' 56.1, Dkt. 147-1 ¶ 28.)  If an operator's run is scheduled for eight hours or less, after they dump the train, the operator then walks to the dispatch office to sign out via Kronos.[4]  (56.1 Reply, Dkt. 150 ¶ 29; Therella Carmichael-Brown Dep., Dkt. 147-4 at 32:12–17.)  If the scheduled run is longer than eight hours, the operator may leave the station immediately after they exit the train.[5]  (56.1 Reply, Dkt. 150 ¶ 32.)  Operators who have to walk to the dispatch office often provide customer service during that walk.  (John Beato Dep., Dkt. 147-12 at 34:10–19, 70:8–23 (operator testifying that, because he wears an MTA badge, he gets "a lot of people . . . asking [him] questions" on his walk to the dispatch office); Julian Cherry Dep., Dkt. 147-15 at 101:20–102:19, 113:14–18 (similar); Desiree Ortiz Dep., Dkt. 147-16 at 102:2–25 (operator testifying that operators are still "on duty" and have to respond to customer inquiries frequently as they walk between the train and the dispatch office).)

The parties dispute exactly how long it takes for 7-line operators to dump a train and walk to the dispatch office, but the record suggests it usually takes somewhere between 5–18 minutes just to dump the train.  (*See* John Beato Dep., Dkt. 147-12 at 60:12–66:17 (operator testifying that it takes anywhere from a few minutes to 15 minutes to reach the end of the track depending on track conditions, and that it takes him three minutes to engage the emergency break, get his

---

[4] Train line superintendents also sign in and out of work using Kronos and are paid according to those entries.  (Therella Carmichael-Brown Dep., Dkt. 147-4 at 26:8–27:17.)  Operators are not paid according to their entries in Kronos, which Defendants use for attendance purposes only.  (*Id.* at 32:12–21.)

[5] However, if the run is scheduled for more than eight hours and the train arrives late, the operator must report to the dispatch office to claim overtime for the time between the train's scheduled arrival and its actual arrival.  (Pls.' 56.1, Dkt. 147-1 ¶¶ 35–36, 39.)

belongings, and lock the train); *see also* Pls.' 56.1, Dkt. 147-1 ¶¶ 65, 67 (Plaintiffs stating that it takes "between five and eight minutes" to dump the train and "between ten and fifteen minutes to get to the dispatcher's office" to sign out).)  Defendants, on the other hand, argue that it takes a total of 10–15 minutes for operators to dump the train *and* walk to the dispatch office.  (*See* Pls.' 56.1, Dkt. 147-1 ¶ 67 (Plaintiffs disputing Defendants' assertion that it takes a total of 10–15 minutes to dump the train and walk to the dispatch office).)  In the end, it is undisputed that operators must spend some period of time *after* their regular paid time ends, to dump their trains and, if required, walk to the dispatch office.

If a regular train operator works more time than they are paid for according to the run schedule (plus boost or radio time), they have to fill out an exception claim form, which the dispatcher must approve for the operator to be paid for that time.  (Lisa Maxwell Dep., Dkt. 147-9 at 56:16–58:9; Pls.' 56.1, Dkt. 147-1 ¶¶ 34, 37.)  Additional time approved through an exception claim form is paid at the overtime rate—that is, time and a half.  (Pls.' 56.1, Dkt. 147-1 ¶ 38.)

## II.     Procedural History

On January 25, 2019, Plaintiff filed this Complaint on behalf of himself and those similarly situated, raising one count of failure to compensate for overtime in violation of the FLSA. (Compl., Dkt. 1 ¶¶ 53–66.)  Defendants filed their Answer on April 5, 2019.  (Answer, Dkt. 11.) After a failed attempt at meditation, the parties proceeded to discovery.  (Dkts. 12, 24.)

On October 9, 2019, Plaintiff served a motion to certify a FLSA collective action.[6] (Dkt. 28.)  On March 26, 2020, the Honorable Ramon E. Reyes, Jr., then the magistrate judge

---

[6] Throughout 2019 and 2020, 34 operators filed consent forms through which they opted in to this collective action.  (*See* Dkts. 14–19, 26, 42, 50–71, 76–79.)  Eight of those individuals subsequently opted out of the action.  (*See* Dkts. 29, 30, 72–74, 92, 117–18.)  Thus, in addition to Finnigan, there are currently 26 opt-in Plaintiffs, 12 of whom worked on the 7-train on a full-time basis, and 14 of whom worked on the 7-line as extras or relief personnel.  (Pls.' 56.1, Dkt. 147-1

assigned to this case, granted the motion in part, conditionally certifying a collective limited to current or former subway operators of the 7-train for a period dating back three years from the service of Plaintiff's motion for certification. (Conditional Cert. Mem. & Order, Dkt. 40 at 1, 7.) Discovery progressed, and on July 2, 2021, Defendants filed a motion to strike certain opt-in Plaintiffs. (*See* Defs.' Mem. Supp. Mot. to Strike, Dkt. 87.) Judge Reyes denied the motion as premature given the lack of a developed record. (Mem. & Order Denying Mot. to Strike, Dkt. 94 at 4–5.) He added that "[o]nce discovery is complete, any opt-in plaintiffs who are not similarly situated to Finnigan can be stricken upon a motion for decertification based on a full record." (*Id.* at 5.)

The parties completed discovery on December 28, 2023. (Dkt. 126.) Defendants' motions for summary judgment and decertification were fully briefed on July 19, 2024. (Dkts. 142–51.)

## LEGAL STANDARD

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (explaining that the summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). In determining whether a genuine issue of fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). The Court also construes any disputed facts in the light most favorable to the nonmoving party. *See Adickes*

---

¶¶ 57–58; *see also* Glenroy Walcott Decl., Dkt. 144-15 ¶¶ 20–23 (explaining that 14 of the opt-in Plaintiffs never "picked" the 7-line as a regular assignment).)

*v. S. H. Kress & Co.*, 398 U.S. 144, 157–59 (1970). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). Once this burden is met, however, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. *Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (alteration in original) (citation omitted). In other words, "[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (citation omitted); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (explaining that a plaintiff must "show more than 'some metaphysical doubt as to the material facts'" to survive summary judgment (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))).

## DISCUSSION

### I.    Summary Judgment

Plaintiffs' overtime claim is based on allegations that Defendants' policy and practice of not compensating operators at the overtime rate for the time they spend dumping their trains and, when required, walking to the dispatch office to sign out, violates the FLSA. In moving for

summary judgment on this claim, Defendants raise a litany of arguments. First, they argue that Plaintiffs' overtime claim is barred, at least in part, by the Portal-to-Portal Act, or that in the alternative, Plaintiffs are already paid adequately for any overtime worked. Defendants further argue that the statute of limitations bars some of Plaintiffs' claims and that liquidated damages are not available. The Court addresses each of these arguments in turn.

**A.    Plaintiffs' Overtime Claim is Not Barred by the Portal-to-Portal Act as a Matter of Law**

      1.    <u>Portal-to-Portal Act</u>

Congress passed the Portal-to-Portal Act ("the Act"), 29 U.S.C. § 254, in response to the Supreme Court's interpretation of certain terms within the FLSA. *IBP, Inc. v. Alvarez*, 546 U.S. 21, 25–26 (2005). Before the Act, the FLSA provided no definitions for the terms "work" or "workweek," and the Supreme Court's early cases interpreted them broadly. *Id.* In passing the Act, Congress directly overrode those interpretations.[7] *Id.* Specifically, the Act clarifies that employers are not liable under the FLSA for failure to compensate or pay overtime for certain activities, including:

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
>
> (2) activities which are preliminary to or postliminary to said principal activity or activities
>
> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

---

[7] In particular, the Act directly superseded a Supreme Court opinion that held that time traveling between iron ore mine portals to underground worksites was compensable under the FLSA, and another holding that time spent walking from timeclocks near a factory entrance to workstations was part of the "statutory workweek." *IBP, Inc.*, 546 U.S. at 25–26 (first citing *Tenn. Coal, Iron & R. Co. v. Muscoda Loc. No. 123*, 321 U.S. 590 (1944); then citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946)).

29 U.S.C. § 254(a). "[A]n activity is integral and indispensable to the principal activities that an employee is employed to perform—and thus compensable under the FLSA—if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 37 (2014).[8]

While Defendants concede that the Act does not preclude Plaintiffs' overtime claims based on the time operators spend train dumping, they argue that time spent "allegedly talking to customers" is not compensable under the Act because it "is not an 'integral and indispensable part' of Plaintiffs' principal activities." (Defs.' Reply Mem. Supp. Summ. J., Dkt. 148 at 3–8.) Defendants argue that the Act precludes that aspect of Plaintiffs' claim because workers, including Plaintiffs, are not owed compensation for time spent "walking or waiting after the cessation of a worker's 'principal job activities.'" (Defs.' Mem. Supp. Summ. J., Dkt. 143 at 8–9.) Plaintiffs, however, argue that they are not only *walking* during that unpaid time period, but are also responding to customer inquiries as they walk to the dispatch office. (Pls.' Mem. Opp'n Summ. J., Dkt. 147 at 12–14.)

The Court finds Plaintiffs have raised a genuine question of material fact as to whether answering customers' questions is an integral and indispensable part of Plaintiffs' jobs as train operators. Multiple operators testified that they typically answered customers' questions while walking to the dispatch office. (John Beato Dep., Dkt. 147-12 at 34:10–19, 70:8–24; Julian Cherry Dep., Dkt. 147-15 at 101:20–102:19, 113:14–18; Desiree Ortiz Dep., Dkt 147-16 at 102:2–25.) At

---

[8] The Act also provides that if the employer shows "to the satisfaction of the court" that it acted in "good faith and that [they] had reasonable grounds for believing that [their] act or omission was not a violation of the [FLSA]," then courts can use their discretion to preclude liquidated damages. 29 U.S.C. § 260. Defendants argue that this good faith exception applies here. For the reasons the Court explains in Discussion Section I.C. *infra*, the Court finds that Defendants have not yet shown that the good faith exception applies.

least one of these operators explained that during their walk to the dispatch office, they are still "on duty" and are expected to respond to these inquiries. (Desiree Ortiz Dep., Dkt 147-16 at 102:2–25.) Indeed, it seems intuitive that a train operators' responsibilities include responding to riders' questions. Surely, anyone who regularly rides the subway has asked a train operator for directions or assistance at some time or another—whether that operator was on the train or not. Consequently, taking into account both the record before it, and common sense, the Court finds there is a genuine question of material fact as to whether Plaintiffs provide customer service during their end-of-shift walk to the dispatch office and whether providing this customer service is an integral and indispensable part of Plaintiffs' employment.

## 2. Defendants' Knowledge of Unpaid Work

Defendants further argue that they did not know Plaintiffs were answering customer questions during their post-shift walks to the dispatch office, and therefore this work is not compensable under the FLSA.[9] (Defs.' Reply Mem. Supp. Summ. J., Dkt. 148 at 7–8.) As with any FLSA claim for unpaid overtime, for an activity to be compensable, plaintiffs must not only show that they performed the work, but also "that the employer had actual or constructive knowledge of that work." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 361 (2d Cir. 2011).

Here, Defendants admit that, from time to time, Plaintiffs would report that they had spent time answering customers' questions while walking to the dispatch office at the end of their shift and would fill out an exception claim form for that time. (Defs.' Reply Mem. Supp. Summ. J., Dkt. 148 at 8 ("[W]hen Plaintiffs *did* report such time, it was substantiated and paid." (emphasis in original)).) Thus, Defendants knew that, at least some of the time, Plaintiffs responded to

---

[9] Defendants argue only that they did know that Plaintiffs provided customer service during their walk to the dispatch office at the end of their respective shifts, not that they did not know that operators *ever* provided customer service. (Defs.' Reply Mem. Supp. Summ. J., Dkt. 148 at 7–8.)

customer inquiries while en route to the dispatch office.  The train operators' testimony, which highlights the frequency with which customers ask train operators questions on the train platforms and in stations, further supports the conclusion that Defendants must have known about this activity to some extent.  (*See* John Beato Dep., Dkt. 147-12 at 34:10–19, 70:8–24; Julian Cherry Dep., Dkt. 147-15 at 101:20–102:19, 113:14–18; Desiree Ortiz Dep., Dkt 147-16 at 102:2–25.) Moreover, the relevant standard only requires that Defendants have *constructive* knowledge of any work activities for those activities to be compensable.  *Kuebel*, 643 F.3d at 361.  Again, it defies common sense and credulity to suggest that Defendants did not know that operators routinely answer riders' questions as the operators make their way along the subway platform to the dispatch office.  Thus, Plaintiffs have raised a genuine question of material fact as to whether Defendants had at least constructive knowledge that Plaintiffs performed this alleged job function as they walked to the dispatch office at the end of their shift.[10]

---

[10] Defendants further argue that the Court should not consider Plaintiffs' argument that they provided customer service during their walk from the train to the dispatch office because Plaintiffs did not specifically allege in their Complaint that they did so.  (Defs.' Reply Mem. Supp. Summ. J., Dkt. 148 at 5–6.)  Plaintiffs' Complaint, however, alleges that operators were still on duty and "working" during the "additional minutes" it took them to "dump the train" at the end of their shift, and to "report to the main office."  (Compl., Dkt. 1 ¶¶ 28, 36.)  Though Plaintiffs admittedly did not allege in their Complaint that the ongoing "work" included providing customer service specifically, the pleading standard does not require that level of specificity.  *See Desarrolladora Farallon S. De R.L. De C.V. v. Cargill, Inc.*, No. 15-CV-0532 (SAS), 2015 WL 7871040, at *4 (S.D.N.Y. Dec. 3, 2015) (holding that "Rule 8 certainly does not require a plaintiff to plead every detail"), *aff'd*, 666 F. App'x 17 (2d Cir. 2016) (summary order).  Contrary to Defendants' assertion, Plaintiffs' argument does not constitute an entirely new theory of liability based upon facts not alleged in the Complaint.  (Defs.' Reply Mem. Supp. Summ. J., Dkt. 148 at 5–6.)  Furthermore, this aspect of Plaintiffs' overtime claim was thoroughly explored during discovery, such that Defendants cannot claim any surprise or lack of notice.  The Court therefore properly considers Plaintiffs' argument in support of their overtime claim that they provided customer service during their walk from the train to the dispatch office.

3.     Lunch Breaks

Defendants argue that they cannot be liable for unpaid overtime under the FLSA because Plaintiffs did not work in excess of 40 hours per week due to payment for their lunch breaks, which do not constitute hours worked.  (Defs.' Mem. Supp. Summ. J., Dkt. 143 at 13–14.)  In essence, Defendants argue that the pay for Plaintiffs' lunch breaks offsets any unpaid overtime.  (*See id.*)  Plaintiffs respond that "Defendants' argument simply does not hold water" because (1) the evidence demonstrates that "Plaintiffs often worked through a large portion of their lunch break," (2) train operators often work many more than 40 hours per week, and thus "even when [their hours worked are] reduced by [their] lunch breaks" Plaintiffs still worked in excess of 40 hours at least some of the time, and (3) the 30-minute bonus payments for missed lunch breaks do not legally offset unpaid overtime compensation.  (Pls.' Mem. Opp'n Summ. J., Dkt. 147 at 17–19.)  The Court agrees with Plaintiffs.

As an initial matter, lunch break pay can be used to offset overtime pay that an employee has earned if the lunch break is a "'[b]ona fide meal period' during which [the employees] are 'completely relieved from duty.'"  *Herrera v. Comme des Garcons, Ltd.*, 84 F.4th 110, 116 (2d Cir. 2023) (first alteration in original) (quoting 29 C.F.R. § 785.19(a)).  "[A]n employee 'is not relieved if he is required to perform any duties, whether active or inactive, while eating.'"  *Id.* (quoting same).  Here, Plaintiffs argue that the record demonstrates that they "often worked through a large portion of their lunch break each day," and thus their lunch breaks do not offset their time worked, because they were not bona fide meal periods.  (Pls.' Mem. Opp'n Summ. J., Dkt. 147 at 17–18.)  Indeed, multiple operators testified that they frequently, if not always, worked through at least some of their lunch breaks.  (*See* Edwin Dixon Dep., Dkt. 147-13 at 105:10–20, 106:3–13 (operator testifying that he worked through at least a portion of his lunch period every day); Desiree Ortiz Dep., Dkt. 147-16 at 108:11–109:8 (similar).)  Consequently, Plaintiffs have

raised a genuine question of material fact as to whether their lunch breaks were "bona fide meal periods" and thus whether their lunch break pay offsets the overtime pay they are seeking in this case.

In addition, Defendants argue that Plaintiffs' alleged unpaid overtime, if any, is non-compensable "in weeks in which Plaintiffs worked fewer than 38 and ¾ hours" (not including lunch breaks) because Plaintiffs' paid lunch breaks offset any unpaid time worked at the end of their shifts.[11]  (Defs.' Mem. Supp. Summ. J., Dkt. 143 at 14.)  As explained, lunch break pay can offset overtime pay if the lunch break is a bona fide meal period.  *Herrera*, 84 F.4th at 116. Whether and how frequently Plaintiffs received bona fide meal periods are questions of fact that cannot be resolved at summary judgment.  Furthermore, the pay sheets produced by Plaintiffs indicate that Plaintiffs often worked far more than 40 hours.  (*See, e.g.*, Finnigan Bi-Weekly Pay Statements, Dkt. 147-17 (demonstrating that Finnigan worked over 40 hours per week on numerous occasions).)

Finally, to the extent that Defendants seek to offset required overtime pay with the bonuses paid to operators when their lunch break is 20 minutes or less, that argument fails as a matter of law.  Department of Labor "regulations require the payment of overtime wages to correspond directly to the number of overtime hours."  *McLean v. Garage Mgmt. Corp.*, 819 F. Supp. 2d

---

[11] This argument is seemingly based on Defendants' assumption that Plaintiffs, at most, worked one hour and 15 minutes of unpaid overtime per week—that is, 15 minutes per day, five days per week.  The record suggests, however, that Plaintiffs may have spent more than 15 minutes dumping the train and walking to the dispatch office, and that Plaintiffs at times worked more than five days per week.  (*See, e.g.*, Finnigan Bi-Weekly Pay Statements, Dkt. 147-17 (demonstrating that Finnigan worked six days per week on numerous occasions); John Beato Dep., Dkt. 147-12 at 60:12–66:17 (operator testifying that it takes anywhere from a few minutes to 15 minutes to reach the end of the track depending on track conditions, and that it takes him three minutes to engage the emergency break, get his belongings, and lock the train); *see also* Pls.' 56.1, Dkt. 147-1 ¶¶ 65, 67 (Plaintiffs stating that it takes "between five and eight minutes" to dump the train and "between ten and fifteen minutes to get to the dispatcher's office" to sign out).)

332, 338 (S.D.N.Y. 2011). As a result, "lump sum payments that are regularly made" and do not

correlate to "the number of overtime hours an employee has worked" do not qualify as overtime

payments. *Id.* at 339. Here, pursuant to the CBA, Plaintiffs receive a bonus payment of "one half-

hour's extra pay" at their regular hourly rate when their lunch break is shorter than 20 minutes

according to the time the train enters and exits the terminal station. (CBA Excerpt, Dkt. 144-18 at

ECF 3.) Because these bonuses are pre-determined amounts that do not vary based on the amount

of overtime an operator works, they cannot be considered overtime pay. *See McLean*, 819 F. Supp.

2d at 338–39; *see also* 29 C.F.R. § 778.310 (explaining that "extra compensation . . . paid in the

form of a lump sum for work performed in overtime hours . . . may not be credited against statutory

overtime compensation due").

### 4.    Radio Time and Boost Time

Defendants conclusorily argue that the radio time that Plaintiffs receive "more than covers

the time it takes for train operators to dump their train." (Defs.' Mem. Supp. Summ. J., Dkt. 143

at 16.) To the contrary, the evidence demonstrates that not all operators are entitled to radio time.

(*See, e.g.*, 56.1 Reply, Dkt. 150 ¶¶ 45–53 (Defendants conceding that not all operators receive

radio time).) Defendants further assert that all operators who are not on Work as Assigned status

can get boost time, which displaces radio time. (*See id.* (Defendants asserting that "[a]ll 7 train

operators are eligible to receive either [r]adio [t]ime or [b]oost [t]ime, unless they have [Work as

Assigned]" status); *id.* ¶ 51 (Defendants alleging that all 7-line operators not on Work as Assigned

status receive at least five minutes of radio or boost time).)

Even if all operators receive five minutes of radio and/or boost time, however, that is

insufficient to defeat Plaintiffs' overtime claim because Plaintiffs raise a genuine question of

material fact as to whether the unpaid activities in question take more than five minutes. (*See* John

Beato Dep., Dkt. 147-12 at 60:12–66:17 (operator testifying that it takes anywhere from a few

minutes to 15 minutes to reach the end of the track depending on track conditions, and that it takes him three minutes to engage the emergency break, get his belongings, and lock the train); *see also* Pls.' 56.1, Dkt. 147-1 ¶¶ 65, 67 (Plaintiffs stating that it takes "between five and eight minutes" to dump the train and "between ten and fifteen minutes to get to the dispatcher's office" to sign out)). Thus, the existence and availability of radio and boost time, without more, does not warrant summary judgment.

### 5.    *De Minimis* Nature of the Claim

Finally, Defendants argue that Plaintiffs' overtime claim should be dismissed because the alleged unpaid time is *de minimis*.  (Defs.' Mem. Supp. Summ. J., Dkt. 143 at 16–18.)   In determining "whether otherwise compensable time should be considered *de minimis*, and therefore not compensable," the Second Circuit has considered the following three factors: "(1) the practical administrative difficulty of recording the additional time; (2) the size of the claim in the aggregate; and (3) whether 'the claimants performed the work on a regular basis.'"  *Reich v. N.Y.C. Transit Auth.*, 45 F.3d 646, 652 (2d Cir. 1995) (quoting *Lindow v. United States*, 728 F.2d 1057, 1062–63 (9th Cir. 1984)).  In considering these factors, Defendants insist that the Court must not consider time Plaintiffs allegedly spend walking to the dispatch office because it is not "time spent actually working."  (Defs.' Mem. Supp. Summ. J., Dkt. 143 at 17–18.)  But as the Court has explained, there is a genuine question of material fact as to whether the time operators spend walking from the train to the dispatch office is compensable work time or not, given that operators often field customer questions during that time.  (*See* Discussion Section I.A.1. *supra*.)  Consequently, the Court does consider the time Plaintiffs spent walking from the train to the dispatch office after the paid portion of their shift has ended in determining whether Plaintiffs' claim should be dismissed as *de minimis*.

Considering the three factors that the Second Circuit applied in *Reich*, the Court finds that the alleged unpaid overtime is not *de minimis*. First, the Court considers "the practical administrative difficulty of recording the additional time." *Reich*, 45 F.3d at 652 (citation omitted). Here, Plaintiffs persuasively argue that there would be very little additional administrative difficulty to record the additional time, since the Kronos system, which operators already use to swipe in and out, is capable of being used to record workers' time for pay purposes. (Pls.' Mem. Opp'n Summ. J., Dkt. 147 at 24.) As Plaintiffs point out, Defendants *already* use Kronos to log other workers' hours for such purposes. (*Id.*; *see also* Therella Carmichael-Brown Dep., Dkt. 147-4 at 26:8–27:17.) Therefore, the additional burden, if any, would be minimal.

Second, the Court considers the size of the claim in the aggregate. *Reich*, 45 F.3d at 652 (citation omitted). Plaintiffs state, though without citing to any evidence, that the aggregate size of the claim over three years "amounts to over $350,000[.]"[12] (Pls.' Mem. Opp'n Summ. J., Dkt. 147 at 24–25.) Because Plaintiffs fail to provide any evidentiary support, or a calculation, for this $350,000 figure, the Court disregards it.[13] However, the Court still finds that this factor weighs in favor of Plaintiffs. The Second Circuit has noted that FLSA relief is appropriate "for claims that might have been minimal on a daily basis but, when aggregated, amounted to a substantial claim." *Perry v. City of New York*, 78 F.4th 502, 532 (2d Cir. 2023) (quoting *Lindow*, 738 F.2d at 1063). Indeed, "an employee made to work a few minutes late *every day* for months has been 'required to give up a substantial measure of his time and effort,' just as has an employee made to work several extra hours in a single day." *Id.* (emphasis in original) (quoting *Mt. Clemens Pottery*

---

[12] Notably, Defendants do not respond to this argument in their reply brief. (*See* Defs.' Reply Mem. Supp. Summ. J., Dkt. 148.)

[13] Plaintiffs are warned that, at trial, they will have to put forth evidence to support this valuation of their claim.

*Co.*, 328 U.S. at 692). After all, "[e]ven a handful of minutes on most days adds up to thousands of minutes of required post-shift work for each [P]laintiff," which is not *de minimis*. *Id.* Here, Plaintiffs allege that at the end of each shift, they had to perform unpaid work which sometimes took more than 20 minutes. (Pls.' 56.1, Dkt. 147-1 ¶¶ 65, 67 (Plaintiffs stating that it takes "between five and eight minutes" to dump the train and "between ten and fifteen minutes to get to the dispatcher's office" to sign out; *see also* John Beato Dep., Dkt. 147-12 at 63:10–18, 66:10–17). In addition, Plaintiffs have at least raised a question of material fact as to whether they also regularly spent time answering customers' questions at the end of their shifts. (*See* Discussion Section I.A.1. *supra*.) Thus, the Court cannot find, as a matter of law, that Plaintiffs' overtime claim is *de minimis* in the aggregate.

Third, the Court must consider "whether 'the claimants performed the work on a regular basis.'" *Reich*, 45 F.3d at 652 (citation omitted). For this factor, "the question is whether the work is regular and predictable versus sporadic and occasional." *Perry*, 78 F.4th at 532. For the same reasons explained above, this factor weighs in favor of finding that Plaintiffs' claim is not *de minimis*. *See id.* (holding that "plaintiffs' post-shift work occurred regularly" because "the tasks had to be performed every day").

In sum, the *Reich* factors suggest that Plaintiffs' claim is not *de minimis*, and the Court declines to grant summary judgment on this ground.[14]

---

[14] The cases Defendants cite in support of their argument that Plaintiffs' claim is *de minimis* do not sway the Court otherwise; in those cases, the same three-factor test was applied, and the factors weighed in favor of a finding that the disputed time was *de minimis*. (*See* Defs.' Mem. Supp. Summ. J., Dkt. 143 at 17 (first citing *Reich*, 45 F.3d at 652; then citing *Singh v. City of New York*, 524 F.3d 361, 371–72 (2d Cir. 2008); then citing *Haight v. Wackenhut Corp.*, 692 F. Supp. 2d 339, 345 (S.D.N.Y. 2010)).) The Court simply comes to a different conclusion based on the facts here.

B.       **Statute of Limitations**

Any cause of action for overtime compensation under the FLSA is subject to a two-year statute of limitations unless the claim arises out of "a willful violation" of the law.  29 U.S.C. § 255(a).  If the violation is willful, then it is subject to a three-year statute of limitations.  *Id.* "Although willfulness can sometimes be determined at the summary judgment stage, the standard for proving willfulness is high."  *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 937 (S.D.N.Y. 2013).  "An employer willfully violates the FLSA when it either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]."  *Kuebel*, 643 F.3d at 366 (citation omitted); *see also McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133– 35 (1988).  Even "if an employer acts unreasonably," the two-year statute of limitations applies so long as it did not behave "recklessly in determining its obligations."  *Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 71 (2d Cir. 2014) (quoting *Reich v. Waldbaum, Inc.*, 52 F.3d 35, 39 (2d Cir. 1995)).  Nor is "mere negligence" sufficient to show willfulness.  *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 207 (2d Cir. 2009).  The burden of proof on the issue of willfulness is borne by the employee.  *Id.* at 207.

Defendants argue that Plaintiffs cannot show reckless disregard for or a knowing violation of the FLSA's requirements.  (Defs.' Mem. Supp. Summ. J., Dkt. 143 at 20.)  Defendants point to the payments they provide in addition to pay for the time that operators are driving the trains, such as pay for a 15-minute preliminary period before the train operators' first run, radio time, and boost time, as demonstrations of good faith efforts to ensure that employees are paid for all of their work. (*Id.*)  In response, Plaintiffs argue that Defendants were aware of their obligations under the FLSA but are willfully non-compliant.  (*See* Pls.' Mem. Opp'n Summ. J., Dkt. 147 at 25–26 (citing *Reich*,

45 F.3d 646).)[15]  Plaintiffs' primary evidence for this argument is that Defendants allegedly failed to record, and pay for, all overtime hours worked, that Defendants leave it up to operators to complete exception claim forms, and that there is no shortform code for operators to use on the claim form that encompasses train dumping and the walk to the dispatch office.  (*Id.* at 26–27.) Defendants counter that they take steps to comply with the FLSA, citing the aforementioned policies.  (*See* Defs.' Mem. Supp. Summ. J., Dkt. 143 at 20 ("Defendants take substantial measures to ensure that they are fully compliant with the FLSA.").)

The Court agrees with Defendants.  Plaintiffs have failed to raise a genuine question of material fact as to whether Defendants' alleged failure to pay the overtime in question is willful, and thus summary judgment on this question is granted to Defendants.  None of the record evidence establishes—or even suggests—an intentional effort to flout the FLSA, or that Defendants have a "reckless disregard" for its requirements.  Indeed, the record seems to affirmatively demonstrate that Defendants *do* try to comply with the FLSA's requirements.  The existence of radio time and boost time, as well as electronic claim forms to report overtime, reflect Defendants' intent and efforts to compensate operators for time worked.  Of course, this suit may ultimately prove that the regime of claim forms, boost time, radio time, and lunch bonuses, does not fully compensate Plaintiffs for all of their time worked.  But the mere fact that Defendants may lose this suit does not render their purported noncompliance willful, or even suggest willfulness, for the purpose of the FLSA's statute of limitations provision.  Put another way, even an unsuccessful attempt at compliance can be made in good faith.

---

[15] *Reich* is a previous FLSA case against the NYCTA that involved the Portal-to-Portal Act.  *See Reich*, 45 F.3d at 646.  *Reich* is factually distinct from the instant case.  (*See* Pls.' Mem. Opp'n Summ. J., Dkt. 147 at 26 n.119 (citing *Reich*, 45 F.3d at 646).)

Plaintiffs' arguments to the contrary are unavailing. Plaintiffs argue that requiring employees to self-report overtime is indicative of a willful disregard for FLSA's non-delegable obligation for employers to maintain accurate records of an employee's time worked. (*See* Pls.' Mem. Opp'n Summ. J., Dkt. 147 at 25–27); 29 U.S.C. § 211(c). Not so. While employers—not employees—bear the ultimate responsibility for ensuring that employees' time sheets reflect an accurate record of all hours worked, *Kuebel*, 643 F.3d at 363, "[a]n employer's timekeeping policies are legal as long as they 'allow [ ] for the complete and accurate recording of all time worked," *Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 27 F. Supp. 3d 313, 321 (E.D.N.Y. 2014) (second alteration in original) (quoting *Zivali v. AT & T Mobility, LLC*, 784 F. Supp. 2d 456, 461 (S.D.N.Y. 2011)). The requirement that employers maintain accurate records of all hours worked, then, simply means that "once an employer *knows or has reason to know* that an employee is working overtime, it cannot deny compensation simply because the employee failed to properly record or claim his overtime hours." *Kuebel*, 643 F.3d at 363 (emphasis added). This obligation is relevant in situations where employers pressure employees not to submit overtime forms, thereby barring the employer from defending against an employee's overtime claim based on the employee's lack of self-reporting. *Id.* Nothing suggests that sort of conduct in this case. Instead, the record suggests that Defendants believe that the systems they have in place are properly compensating operators for all time worked. Furthermore, Defendants are not arguing that Plaintiffs are not entitled to recovery based on the lack of employee self-reporting; rather, Defendants are arguing that the unpaid time spent in transit to the dispatch office is not

compensable, whether reported or not, and that all other time allegedly worked by Plaintiffs was compensable. (Defs.' Mem. Supp. Summ. J., Dkt. 143 at 8–16.)[16]

Since Plaintiffs have not raised a genuine question of material fact as to whether the alleged FLSA violations were willful, the Court holds that the two-year statute of limitations under 29 U.S.C. § 255 applies, and that therefore, as discussed below, the collective will be limited to two years before Plaintiffs served their initial certification motion, which will result in some of the opt-in Plaintiffs being removed from the collective.

## C.    Liquidated Damages

Lastly, Defendants argue that they have acted in good faith and that as a result, they are entitled to the Portal-to-Portal Act's good faith defense to liquidated damages pursuant to 29 U.S.C. § 260. Under this defense, the employer bears the burden of showing by "plain and substantial evidence subjective good faith and objective reasonableness." *Reich v. S. New Eng. Telecomms. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997) (citation omitted). If the employer prevails in this defense, available damages are limited to unpaid wages. *Id.* The *Southern New England Telecommunications Corp.* court noted that the burden for the good faith defense "is a difficult

---

[16] In support of their willfulness argument, Plaintiffs point to the fact that the MTA's exception claim forms do not allow an operator to claim this type of overtime. (*See* Pls.' Mem. Opp'n Summ. J., Dkt. 147 at 26–27 (arguing that "a train operator cannot submit an [exception claim form] for the additional fifteen (15) minutes of work performed after a train is clocked in . . . [T]here is no . . . code for the time it [takes to]" dump the train "and then walk up to the dispatch office to sign out").) Plaintiffs further argue that, "[b]y excluding a code for this time worked, Defendants acknowledge that train operators are working time for which they are not being compensated." (*Id*. at 27.) The Court, however, does not find this argument persuasive. First, the absence of a code for time spent dumping the train and walking to dispatch is consistent with Defendants' position that this time is not compensable and does not, in itself, show that Defendants are preventing operators from claiming overtime that Defendants know or believe the operators are entitled to. Second, the Court disagrees with Plaintiff that it logically follows that by not including the code at issue, Defendants "acknowledge that train operators are working time for which they are not being compensated," (*id.*)—that simply makes no sense.

one to meet" and that "double damages are the norm." *Id.* (quoting *Brock v. Wilamowsky*, 833 F.2d 11, 19 (2d Cir. 1987)). While "the good faith determination is a question of law for the court to decide 'in its sound discretion,'" that determination often cannot be made until underlying questions of fact have been resolved at trial. *Perry v. City of New York*, No. 13-CV-1015 (VSB), 2019 WL 7047327, at *2 (S.D.N.Y. Dec. 23, 2019) (quoting 29 U.S.C. § 260), *aff'd*, 78 F.4th 502 (2d Cir. 2023).

That is the case here. In arguing that liquidated damages are not available, Defendants cite no evidence whatsoever. (*See* Defs.' Mem. Supp. Summ. J., Dkt. 143 at 20–21.) Consequently, Defendants necessarily have not met the good faith standard's "difficult burden." *S. New Eng. Telecomms. Corp.*, 121 F.3d at 71. At trial, they may present evidence to show good faith. But they have not directed the Court to any such evidence at this time. The Court therefore denies Defendants' motion for summary judgment as to liquidated damages.

*    *    *

For the reasons explained above, the Court grants Defendants' motion for summary judgment in part and denies it in part. Plaintiffs' claim will proceed, but the two-year statute of limitations under 29 U.S.C. § 255 applies.

## II. Decertification

In addition to moving for summary judgment, Defendants also move for decertification of the collective in this case. Courts in this Circuit use a two-step method in assessing whether to certify a collective action. *Myers v. Hertz Corp.*, 624 F.3d 537, 554–55 (2d Cir. 2010). First, before significant discovery takes place, the court makes "an initial determination to send notice to potential opt-in plaintiffs who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred." *Id.*; *see also Puglisi v. TD Bank, N.A.*, 998 F. Supp. 2d 95, 99 (E.D.N.Y. 2014). Courts often refer to this first step as the "conditional certification"

stage. *See, e.g.*, *Puglisi*, 998 F. Supp. 2d at 99.  At the conditional certification stage of this case, Judge Reyes found Finnigan's submissions satisfied his burden of "a modest factual showing that he is similarly situated to other operators of the '7' line with respect to the alleged violations of the FLSA, namely lack of overtime pay." (Conditional Cert. Mem. & Order, Dkt. 40 at 4.)  Judge Reyes certified the following class for an FLSA collective action: "subway operators or former subway operators of the '7' train for a period of time dating back three years from the filing of Plaintiff's motion [on October 9, 2019]." (*Id.* at 1.)

This case is now at the second stage of certification, which takes place after discovery. *Myers*, 624 F.3d at 555.  At the second stage, "the district court will, on a fuller record, determine whether a so-called 'collective action' may go forward by determining whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs." *Id.*; *Zivali*, 784 F. Supp. 2d at 460 (noting that courts apply "a more 'stringent standard' of proof in determining whether plaintiffs are similarly situated for the purposes of the FLSA" at the second stage of certification (quoting *Damassia v. Duane Reade, Inc.*, No. 04-CV-8819 (GEL), 2006 WL 2853971, at *3 (S.D.N.Y. Oct. 5, 2006))).  Thus, on Defendants' post-discovery motion for decertification, the Court must apply a higher level of scrutiny than Judge Reyes did at conditional certification to determine whether Plaintiffs are similarly situated for the purposes of the FLSA.

Here, Defendants contend that decertification of at least some opt-in Plaintiffs is appropriate because (1) certain Plaintiffs never worked a full week on the 7-line; (2) Plaintiffs' claim does not stem from a systematically applied, unlawful policy or practice; (3) the available Plaintiffs' testimony shows their situations are individualized; and (4) Defendants have individualized defenses for the claim proffered by each Plaintiff. (Defs.' Mem. Supp. Summ. J., Dkt. 143 at 21–32.)

### A.    Legal Standard

Although the Second Circuit has yet to endorse a set of criteria to apply on a motion for decertification, *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 514–15 (2d Cir. 2020), district courts generally analyze whether the following factors counsel for or against maintaining a collective action: "(1) disparate factual and employment settings of the individual plaintiffs; (2) defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations," *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 352 (E.D.N.Y. 2008) (quoting *Guzman v. VLM, Inc.*, No. 07-CV-1126 (JG) (RER), 2007 WL 2994278, at *3 (E.D.N.Y. Oct. 11, 2007)); *see also, e.g.*, *Severino v. Avondale Care Grp., LLC*, No. 21-CV-10720 (LGS) (SDA), 2022 WL 16555372, at *3 (S.D.N.Y. Oct. 29, 2022); *Zhang v. Nexus Holidays N.Y., Inc.*, No. 20-CV-0275 (AMD) (CLP), 2021 WL 11711493, at *3 (E.D.N.Y. Oct. 14, 2021).  If the court concludes that the opt-in plaintiffs in a FLSA action are similarly situated, the action proceeds collectively; if not, "the class is decertified, the claims of the opt-in plaintiffs are dismissed without prejudice, and the class representative may proceed on his or her own claims." *Zivali*, 784 F. Supp. 2d at 460 (citing *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 197 (S.D.N.Y. 2006)).  That said, if a court finds that only some opt-in plaintiffs are similarly situated, it can partially decertify the collective as necessary.  *See Seward v. Int'l Bus. Machines Corp.*, No. 08-CV-3976 (VB) (PED), 2012 WL 13059788, at *12 (S.D.N.Y. Jan. 20, 2012) (explaining that "[i]n some cases, where the record following discovery reveals that only some plaintiffs or claims are actually similar, the [c]ourt may decide in its discretion to grant a decertification motion only in part" and collecting cases), *R. & R. adopted*, 2012 WL 860363 (S.D.N.Y. Mar. 9, 2012); *see also Puglisi*, 998 F. Supp. 2d at 101 (explaining that, at the second stage of certification, courts "may very well . . . decertify the class or divide it into subgroups").

B.    **Application**

1.    Statute of Limitations

As an initial matter, as previously explained, the record does not suggest that Defendants willfully violated the FLSA.  Therefore, while it was appropriate for Judge Reyes to conditionally certify those who worked on the 7-line within three years of the filing of Finnigan's conditional certification motion based on the allegations in the Complaint, the Court now finds that the applicable statute of limitations is two years.  (*See* Discussion Section I.B. *supra*; *see also* Conditional Cert. Mem. & Order, Dkt. 40 at 6–7.)  As such, any opt-in Plaintiffs who did not work on the 7-line within two years of October 9, 2019, must be decertified.

2.    Collective Action Factors

Next, the Court addresses the three factors district courts generally analyze in determining whether a collective action is warranted.  *See Laroque*, 557 F. Supp. 2d at 352.  For the reasons described below, the Court finds that a collective action is appropriate only as to those Plaintiffs who worked 40 hours or more on the 7-line during at least one week of the collective action period—that is, after October 9, 2017.

a)    Disparate Factual and Employment Settings

First, the Court does not find that merely operating the 7-line at any point within the relevant time period is sufficient to make an operator similarly situated for purposes of this litigation.  Plaintiffs argue that because the conditionally certified collective included any employee who had operated the 7-line for any amount of time in the last three years, the Court should permit all opt-in Plaintiffs in that category to proceed.  (Pl.'s Opp'n Summ. J., Dkt. 147 at 30; *see also* Conditional Cert. Mem. & Order, Dkt. 40 at 1.)  But, at this stage, the Court has the benefit of a fuller evidentiary record, and it must exercise closer scrutiny in certifying a collective. *Myers*, 624 F.3d at 555.  In other words, at this stage of the litigation, the Court cannot simply

rubber stamp Judge Reyes' prior determination.  *See Zivali*, 784 F. Supp. 2d at 460 (explaining that courts apply a "more stringent standard" to certification determinations post-discovery).  Thus, the question is not whether the opt-in Plaintiffs meet the definition outlined at the conditional certification stage, but whether they are truly similarly situated based on the evidence proffered by the parties.

A 7-line operator who only worked a single shift, or sporadic shifts throughout the relevant time period, cannot be owed overtime payments under the FLSA for that work.  It is true that "individual differences in number of hours worked . . . will not warrant decertification as long as [p]laintiffs show they are subject to a 'single decision, policy, or plan'" that violates the FLSA.  *McGlone v. Contract Callers, Inc.*, 49 F. Supp. 3d 364, 367–68 (S.D.N.Y. 2014) (quoting *Alonso v. Uncle Jack's Steakhouse, Inc.*, No. 08-CV-7813 (DAB), 2011 WL 4389636, at *3 (S.D.N.Y. Sept. 21, 2011)).  But, assuming the record shows there is an unlawful policy, only those who worked overtime are subject to it.  *See* 29 U.S.C. § 207(a)(2)(C) (stating that eligible workers can bring FLSA claims "for a workweek longer than forty hours").  It would defy logic to certify Plaintiffs as a part of this collective if they ultimately will not be able to recover any wages under the FLSA as a matter of law.  Thus, to the extent that any of the opt-in Plaintiffs have not worked over 40 hours in one week on the 7-train during the certification period, they are decertified from the collective.

Presumably, then, most or all of the opt-in Plaintiffs who worked on the 7-line only as extras or relief personnel will be decertified from the collective.  However, the Court notes that Defendants have not shown as a matter of law that extras and relief personnel are not similarly situated, apart from potentially not qualifying for overtime pay due to working fewer than 40 hours per week on the 7-line.  In their Rule 56.1 Statement, Defendants assert that different policies apply

27

to extras and relief personnel, but the evidence that they cite for that point does not support the proposition.  (*See* Defs.' R. 56.1 Statement, Dkt. 145 ¶ 59.)  Because Defendants do not provide any evidentiary support for this assertion, however, the Court does not consider it.  *See Giannullo*, 322 F.3d at 140 (holding that courts need not consider "factual assertions" contained in 56.1 statements "that are . . . unsupported in the record").

To the contrary, the Court finds that the remaining opt-in Plaintiffs—that is, all opt-in Plaintiffs who worked more than 40 hours per week on the 7-line during a given week in the relevant period—are similarly situated.  Each of those Plaintiffs were 7-line operators who shared the same job responsibilities and were subject to the same wage and overtime payment structure that gave rise to this action.  (*See, e.g.*, Pls.' 56.1, Dkt. 147-1 ¶¶ 11–24, 61, 64–65 (the parties describing the operators' duties and Defendants' generally applicable employment practices and policies).)  Therefore, the remaining Plaintiffs are sufficiently similar to form a FLSA collective.

b)    <u>Individualized Defenses</u>

"The second relevant factor is the extent to which Defendants will assert individualized defenses."  *DeSilva*, 27 F. Supp. 3d at 325.  When the defenses available to the employer are "highly individualized as to each Plaintiff, 'this factor weighs heavily against proceeding . . . as a collective action.'"  *Id.* (quoting *Zivali*, 784 F. Supp. 2d at 467–68).  Defendants argue that collective certification is inappropriate because resolving each Plaintiff's claim would require an individualized factual assessment.  (Defs.' Mem. Supp. Summ. J., Dkt 143 at 30.)  Specifically, Defendants argue that for each Plaintiff, the jury would have to determine "(1) whether they did in fact work overtime; (2) the amount of overtime worked; (3) whether they were paid for overtime worked; and (4) whether Defendants had knowledge of any overtime hours performed."  (*Id.*)  Additionally, Defendants assert that Plaintiffs must show actual or constructive notice of the alleged overtime worked because there was a policy of paying overtime, and that this too would

"require[] a careful analysis of each Plaintiff's circumstances." (*Id.* at 29–30.) These arguments have no merit.

First, Defendants claim that their defenses require a factual inquiry into whether each Plaintiff actually worked overtime and whether Defendants had actual or constructive knowledge of that overtime. (Defs.' Mem. Supp. Summ. J., Dkt. 143 at 28–30.) The Court disagrees. As an initial matter, the Court has decertified any Plaintiffs who did not work more than 40 hours on the 7-line in a given week. (*See* Discussion Section II.B.1. *supra*.) Beyond that, "[t]he existence of individual differences in number of hours worked . . . will not warrant decertification, as long as Plaintiffs show they are subject to a single decision, policy, or plan." *See Alonso*, 2011 WL 4389636, at *3 (citation omitted). Indeed, if mere differences in the number of overtime hours worked defeated certification, many—if not all—FLSA collective actions would be barred; seldomly, if ever, will every plaintiff in a collective have worked the exact same amount of overtime. And, because Plaintiffs have sufficiently shown that the remaining collective members are all 7-line operators who worked overtime and are subject to the same "policy or plan" that allegedly results in unpaid overtime, (*see* Discussion Section II.B.2.a. *supra*), the same factual inquiries and defenses apply to them.

Further, Defendants' argument that the FLSA's knowledge requirement demands individualized analysis is unpersuasive. (*See* Defs.' Mem. Supp. Summ. J., Dkt. 143 at 30.) True, "[i]*n the absence of a company-wide policy or practice*," the law requires that plaintiffs "demonstrate that each individual manager had actual or constructive knowledge that plaintiffs were performing off-the-clock work without proper compensation." *Zivali*, 748 F. Supp. 2d at 468 (emphasis added). But here, the policies and practices that resulted in the alleged unpaid overtime apply to all Plaintiffs in the collective: as a matter of MTA policy and practice, no operators are

paid for train dumping or walking to the dispatch office after the paid portion of their shifts ends. *See DeSilva*, 27 F. Supp. 3d at 325 (noting that individualized actual or constructive notice must be shown "[w]here . . . there is no uniform policy or practice"). Because Plaintiffs are subject to the same policies and practices, Plaintiffs need not demonstrate that each individual manager had actual or constructive knowledge of any overtime worked. Instead, they merely need to prove that Defendants had notice that 7-line operators were engaged in the purported unpaid overtime tasks. Such a showing need not be individualized.

Taking into account the foregoing, Defendants have not shown a need to rely on highly individualized defenses. Thus, this factor also weighs in favor of certifying the collective, as modified.

c)    Fairness and Procedural Considerations

Finally, the Court turns to whether fairness and procedural considerations counsel for or against decertification. In doing so, the Court considers "whether a collective action would lower costs to the plaintiffs through the pooling of resources, efficiently resolve common issues of law and fact, and coherently manage the class in a manner that will not prejudice any party." *Jason v. Falcon Data Com, Inc.*, No. 09-CV-3990 (JG) (ALC), 2011 WL 2837488, at *4 (E.D.N.Y. July 18, 2011).

Here, fairness and procedural considerations weigh in favor of allowing the remaining Plaintiffs to proceed collectively. First, collective FLSA actions allow plaintiffs to pool their resources in bringing their claims, which "best serves the purposes of the statute." *Montiel-Flores v. JVK Operations Ltd.*, No. 19-CV-3005 (JS) (SIL), 2023 WL 5979209, at *7 (E.D.N.Y. Aug. 1, 2023). Secondly, limiting the controversy to one proceeding promotes efficient resolution of the common issues of law and fact that have arisen from the same underlying activity. *Ravenell v. Avis Budget Car Rental, LLC*, No. 08-CV-2113 (SLT) (SMG), 2015 WL 12711850,

at *5 (E.D.N.Y. Jan. 12, 2015).  Even if each Plaintiff must testify at trial, that would not amount to the Court holding "individualized mini-trials" as Defendants suggest.  (Defs.' Mem. Supp. Summ. J., Dkt. 143 at 31.)  Lastly, because the collective now is not particularly numerous, proceeding collectively would be manageable and would not prejudice Defendants.  As such, fairness and procedural considerations support certification.

*     *     *

For the reasons explained above, the Court partially decertifies the collective action. Specifically, the Court limits the collective action to operators of the 7-line who worked more than 40 hours per week on that line during the collective period—that is, after October 9, 2017, two years prior to the filing of Plaintiffs' motion for conditional certification of the collective.  All other Plaintiffs are dismissed without prejudice. *See Myers*, 624 F.3d at 555 (explaining that if a collective is de-certified, "the opt-in plaintiffs' claims may be dismissed without prejudice").

**CONCLUSION**

For the reasons explained herein, the Court grants in part and denies in part both Defendants' motion for summary judgment and their motion for decertification. The collective is fully certified as to all Plaintiffs who worked more than 40 hours per week on the 7-line after October 9, 2017, and Plaintiffs' FLSA overtime claim will proceed to trial. Plaintiffs are directed to file a list of Plaintiffs they believe can still be included in the collective within thirty (30) days of this Order, and Defendants may file a motion to strike any Plaintiffs they believe can no longer be part of the collective within thirty (30) days after Plaintiffs file their list. The parties are also directed to file a proposed joint pre-trial order pursuant to this Court's Individual Rules within ninety (90) days of the date of this Order.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 31, 2025
Brooklyn, New York